*Milton A. Kramer Law Clinic Center*
*Case Western Reserve University School of Law*
11075 East Blvd., Cleveland, OH 44106

April 20, 2020

Deborah S. Hunt, Clerk
Sixth Circuit Court of Appeals
Potter Stewart U.S. Courthouse
100 East Fifth Street
Cincinnati, Ohio 45202

**Re: Notice of Supplemental Authority (Fed. R. App. P. 28(j))**
***Koger v. Mohr*, Sixth Circuit Case No. 19-4020**

Dear Ms. Hunt,

As supplemental authority, Appellant respectfully submits this Court's recent decision in *Fox v Washington*, --- F.3d ---, No. 19-1398 (6th Cir. 2020) (attached), reversing a judgment in favor of the Michigan Department of Corrections in a case alleging violations of RLUIPA. In *Fox*, this Court emphasized that RLUIPA inquiries in this Circuit follow the analysis *Haight v. Thompson* 763 F.3d 554 (6th Cir. 2014), which calls for "individualized" inquiries turning on the impact to the individual inmate and not the facial validity of the policy applied generally. *Fox* at 10. *Fox* makes it clear that *Haight*, and not the "even-handed application" language from *Hoevenaar v. Lazaroff*, 422 F. 3d 366 (6th Cir. 2005) cited by the district court in this case (*see* Doc.56, PageID # 659), controls the analysis in this case. Appellant's Brief, Doc. 6 at 29-32.

*Fox* also cautions against prisons placing "substantial pressure on [incarcerated people] to modify [their] behavior and to violate [their] beliefs." *Id.* at 12, citing *Haight* at 565. In this case, ODRC places "substantial pressure" on Koger to alter his religious beliefs, including by

denying him fasting accommodations unless he identifies as Muslim. Appellant's Br. at 10, 19.

Finally, this Court remanded with instructions to take additional evidence to evaluate the fact-intensive third step of RLUIPA: whether the prison met its "heavy burden" in showing of governmental interest that is "genuine, not hypothesized, or invented *post hoc* in response to litigation." *Id*. at 16. Appellant's Br. at 29-32.

Respectfully Submitted,

*/s/ Andrew Geronimo*[1]
Andrew Geronimo
*Lead Counsel*
MILTON A. KRAMER LAW CLINIC CENTER
CASE WESTERN RESERVE UNIVERSITY SCHOOL OF LAW
11075 East Boulevard
Cleveland, Ohio 44106
Tel.: 216.368.2766
Fax: 216.368.5137
*andrew.geronimo@case.edu*

*Counsel for Plaintiff-Appellant Cecil Koger*

[1] Counsel thanks Benjamin Kuhlmann, Certified Legal Intern in the Milton A. Kramer Law Clinic Center, for his substantial efforts in researching and drafting this letter.

## CERTIFICATE OF SERVICE

I hereby certify that I filed Plaintiff-Appellant Cecil Koger's Letter with Citation of Supplemental Authority using the Court's electronic filing system on April 20, 2020. The court's filing system will electronically serve all parties of record.

*/s/Andrew Geronimo*
Andrew Geronimo
*Counsel for Plaintiff-Appellant Cecil Koger*

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0038p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

JAMES HARRISON FOX; SCOTT DAVID PERREAULT,
*Plaintiffs-Appellants*,

*v*.

HEIDI E. WASHINGTON, in her official capacity as Director of the Michigan Department of Corrections,
*Defendant-Appellee*.

No. 19-1398

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:13-cv-01003—Phillip J. Green, Magistrate Judge.

Argued: December 4, 2019

Decided and Filed: February 6, 2020

Before: GRIFFIN, STRANCH, and DONALD, Circuit Judges.

## COUNSEL

**ARGUED:** Ryan Keast, MICHIGAN STATE UNIVERSITY COLLEGE OF LAW, East Lansing, Michigan, for Appellants. Sarah R. Robbins, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Daniel E. Manville, MICHIGAN STATE UNIVERSITY COLLEGE OF LAW, East Lansing, Michigan, for Appellants. Kyla L. Ragatzki, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

---

**OPINION**

---

GRIFFIN, Circuit Judge.

Plaintiffs, who are Michigan prisoners, appeal the denial by the Michigan Department of Corrections of their request to "recognize" their "Christian Identity" religion. Plaintiffs' Christian Identity religion advocates "white separatism," which instructs that people of different races not mix in "the areas of marriage and worship." Plaintiffs claim that the Department's denial of their recognition request violated the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc et seq. ("RLUIPA"), by denying them their rights of group worship and baptism. Following a non-jury trial, the district court ruled that the Department's decision did not substantially burden plaintiffs' exercise of their religion under the second of the three-step analysis for evaluating RLUIPA claims. *See Holt v. Hobbs*, 574 U.S. 352, 361–62 (2015). We hold that the district court committed error requiring reversal in its ruling. Accordingly, we reverse and remand for consideration and a ruling on whether the Department satisfied the standard of strict scrutiny under RLUIPA's third step.

I.

A.

Plaintiffs James Fox and Scott Perreault are inmates at prisons administered by the Michigan Department of Corrections ("MDOC"). They adhere to a religion known as Christian Identity (also called the "Church of Israel"). *Fox v. Washington*, No. 1:13-CV-01003-PJG, 2019 WL 1409375, at *7 n.5 (W.D. Mich. Mar. 27, 2019). Perreault has been a member of Christian Identity for over twenty years, long before he went to prison; Fox has been a member since 2012, after he entered prison. Three tenets of the Christian Identity religion as practiced by Fox and Perreault are at issue: (1) observance of seven "Biblical Holy Days,"[1] (2) weekly congregation

---

[1]The seven holidays are "Passover, the Feast of Unleavened Bread, Pentecost, Trumpets, the Day of Atonement, the Feast of Tabernacles, and the Last Great Day." The activities required to properly observe these holidays vary. Most require a "holy convocation unto the Lord," that is, "a church gathering," which lasts about two

for group worship on the Sabbath, and (3) baptism by full body immersion.[2] Plaintiffs believe that their religion requires each of these activities.

Their religion is also explicitly racist. According to Perreault, adherents of Christian Identity describe themselves as "literal lineal descendants of the twelve tribes of Israel," who "grew into the millions in the Caucasian Mountains" and "moved through eastern Europe, central Europe, [and] western Europe." In Perreault's words, Caucasians are "God's chosen" people who should not mix with other races "in marriage and worship." Moreover, people of "different races[ ] should not be cohabitating together." This is "a large component of the Christian Identity faith."

In other areas of life, plaintiffs apparently have no objection to communicating or interacting with people of other races. And plaintiffs claim that they are not racist.

Perreault believes that "separatism is commanded. Racism is a choice which is just overt hate," and he does not "hate anyone that is Biblically different" from him. Fox believes that Christian Identity teaches him "to remain separate from non-white people and not to hate them." Plaintiffs' belief in "white separatism" influences their requests to congregate, both on holidays and on the Sabbath, as they insist that they must worship only with other adherents of Christian Identity—who must also be Caucasians.

Plaintiffs contend they cannot engage in group worship because MDOC does not recognize Christian Identity as a religion.[3] While they are allowed to attend the services of other religions that have been recognized by the Department, they have chosen not to because of the differences between Christian Identity and those other faiths. Two recognized religions, Judaism and the Seventh-day Adventist Church, observe the same holidays as Christian Identity. But

---

hours. Some require a special meal or fasting, and at least one requires "no servile work" to be done for an entire day.

[2]According to the Christian Identity religion, this need only happen one time (after age twenty), and full immersion is necessary. In the opinion of Perreault, "I could be baptized in a lake. We could dig a hole in the yard and fill it with water, and as long as I'm fully immersed, the job would be done." Perreault says he was not baptized before entering prison because he "was still maturing in [his] faith."

[3]Celebrating Christian Identity's holidays requires other conduct in some instances, but in this appeal, plaintiffs focus on the group-worship aspect.

"Seventh-Day Adventists worship on Saturday," so their worship service and plaintiffs' "wouldn't fall on the same day." Also, plaintiffs calculate the correct date to observe their holidays using the "solar calendar," while adherents of Judaism and the Seventh-day Adventist Church "use a lunar calendar." This results in their holidays falling on different days.

There are also differences between their religion's beliefs and others the Department has recognized. Perreault does not wish to observe holidays or the Sabbath with Jewish inmates because "the Jewish faith denies Jesus Christ." Perreault attended a few Catholic services in 2009, but stopped going because "the Catholic denomination did not teach Christianity as [he] understand[s] it." Fox tried attending other Christian services but stopped going because "[t]hey don't practice racial separatism" and "they did not comply with what the Bible teaches." According to Perreault, Christian Identity uses a different version of the Bible from other Christian denominations, whose versions he describes as "adulterated." Thus, plaintiffs assert that their "religious needs [cannot] be met by the existing religious programming within the MDOC."

Not being able to observe Christian Identity's holidays "affects [Perreault] greatly" because it makes him "disobedient to Jehovah." Perreault also believes that not being baptized "affects [his] salvation of [his] eternal soul. It puts [his] eternal soul at risk of eternal damnation." Not being able to observe the holidays "worries" Fox because "[i]t hinders [his] connection with God and [his] relationship with Him." His lack of being baptized similarly "causes [Fox] worry" because "by not being allowed to be baptized, . . . [he] could die without being baptized and that would be bad."

B.

MDOC has a process by which it decides whether to "recognize" a particular religion. "[W]ithout that recognition, a number of prisoners would not be able to get together in a specific space to do group worship." The Department recognizes roughly twenty religions, including the "Nation of Islam, Moorish Science Temple, Catholic, Native American," and several Protestant denominations. Even for recognized religions, however, MDOC does not accommodate every

religious holiday due to limited resources, as its "facilities are scrambling for time and space for all of the various programs that they currently have to accommodate."

Prisoners whose religions are not recognized by MDOC are not officially prohibited from exercising their religious beliefs; they just do not have the same privileges as members of recognized religions. For example, a prisoner may request baptism regardless of "whether [he] belongs to an officially recognized group." Similarly, a prisoner may request a religious diet via a "separate process" that does not require being a member of a recognized religion.

David Leach oversees MDOC's "religious programming" as its Special Activities Coordinator. When he receives a request for the Department to recognize a religion, he consults the Chaplain Advisory Council ("CAC"), which consists of members of different religious organizations and belief systems in the community. Leach then makes a recommendation to Kenneth McKee, the Deputy Director for Correctional Facilities Administration, who has final authority to decide whether the Department will recognize a particular religion.

Plaintiffs requested that MDOC recognize Christian Identity so they could engage in group worship. Leach met with the CAC and researched Christian Identity to determine whether it "exist[ed] outside of the prison setting" and whether its beliefs "were completely unique to this particular faith group or . . . at least the core or primary beliefs [could] be met in existing religious programming." Their research consisted primarily of conducting internet searches and reviewing the articles and other documents it yielded. The CAC recommended that plaintiffs' request be denied. It found that "many core religious beliefs of the Christian Identity religion are similar to those of other Christian religious groups recognized by MDOC and therefore the religious beliefs and practices of the Christian Identity religion can be adequately met by an existing recognized religious group."

Leach submitted a one-page memorandum recommending that plaintiffs' request for recognition be denied. He adopted the CAC's recommendation that adherents of Christian Identity could have their religious needs met by an existing recognized religious group. He also stated that "although it would not factor into whether or not the Christian Identity religion should be recognized as a religious group, the Christian Identity movement is known to have extreme

racist and anti-Semitic views with a history of violence in the United States," and ties to the Ku Klux Klan and other white supremacist groups. Thus, Leach determined that "the practice of the Christian Identify [sic] movement would pose a threat to the custody, and security of our correctional facilities." Deputy Director McKee adopted Leach's recommendation in full and denied recognition of Christian Identity "due to the threat to the custody and security at all correctional facilities."

Plaintiffs also made a separate request to be baptized by full immersion. MDOC approved this request and scheduled a date to perform the baptisms, but the district court unintentionally "scheduled a settlement conference that apparently resulted in Mr. Fox and Mr. Perreault not being given their baptism by immersion." Plaintiffs have still not been baptized.

C.

Fox and Perreault filed a pro se complaint in the United States District Court for the Western District of Michigan, naming several MDOC employees as defendants. The complaint alleged that Christian Identity required observance of the holidays listed above, congregation for worship services, and baptism by full body immersion, and that the defendants had "denied the plaintiffs the practice of sincerely held religious beliefs." They requested declaratory relief, including "department wide recognition of Christian Identity as a distinctly separate faith group" and "the observance of all Biblical Holy days and Baptism by full body immersion for all adherents of the Christian Identity faith." An amended complaint clarified that plaintiffs' claims were based in the First Amendment and RLUIPA.

After this case cleared several procedural hurdles and had been pending for nearly four years, the district court appointed counsel for plaintiffs. The parties then consented to the jurisdiction of the United States Magistrate Judge to conduct all further proceedings.[4] *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. Eventually, a bench trial commenced in the district court. Following proofs and post-trial briefs, the district court entered judgment in the Department's favor on both claims. *Fox*, 2019 WL 1409375, at *1. Regarding the RLUIPA claim, the only

[4]The parties also stipulated to substituting defendant Washington, the Director of MDOC, as the sole named defendant in her official capacity and dismissing the other defendants, since plaintiffs sought only injunctive relief. We use "the Department" and "MDOC" throughout this opinion for convenience.

claim at issue in this appeal, the district court ruled that plaintiffs failed to show that the Department had imposed a "substantial burden" on their exercise of religion as required by RLUIPA. *Id.* at *8.

II.

"After a bench trial, we review the district court's factual findings for clear error and its conclusions of law de novo." *Foster v. Nationwide Mut. Ins. Co.*, 710 F.3d 640, 643–44 (6th Cir. 2013). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Osborn v. Griffin*, 865 F.3d 417, 436 (6th Cir. 2017) (citation and internal quotation marks omitted).

III.

RLUIPA "provide[s] very broad protection for religious liberty." *Holt*, 574 U.S. at 356 (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014)). For our purposes, it mandates that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability," unless the government can satisfy strict scrutiny. 42 U.S.C. § 2000cc-1(a). This requires showing that the burden imposed on a person's religious exercise "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." § 2000cc-1(a)(1)–(2).

RLUIPA defines "'religious exercise' capaciously to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" *Holt*, 574 U.S. at 358 (quoting § 2000cc-5(7)(A)). And Congress specified that RLUIPA "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." § 2000cc-3(g). Courts have recognized that, in the prison context, RLUIPA provides greater protections than the First Amendment. *See Colvin v. Caruso*, 605 F.3d 282, 296 (6th Cir. 2010) (citing *Lovelace v. Lee*, 472 F.3d 174, 199–200 (4th Cir. 2006)).

To enforce RLUIPA, Congress "created a private cause of action that empowers inmates to obtain 'appropriate relief' from those who violate the statute." *Haight v. Thompson*, 763 F.3d 554, 558 (6th Cir. 2014) (quoting § 2000cc-2(a)). If a government is found to have imposed a substantial burden on religious liberty and cannot satisfy strict scrutiny, it has several options. It may "chang[e] the policy or practice that results in a substantial burden," retain the policy or practice "and exempt[ ] the substantially burdened religious exercise," provide an exemption from the policy or practice "for applications that substantially burden religious exercise," or use "any other means that eliminates the substantial burden." § 2000cc-3(e). The statute makes clear that it "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." § 2000cc-3(c).

Analysis under RLUIPA is a "three-act play." *Cavin v. Mich. Dep't of Corr.*, 927 F.3d 455, 458 (6th Cir. 2019). First, "the inmate must demonstrate that he seeks to exercise religion out of a 'sincerely held religious belief.'" *Id.* (quoting *Holt*, 574 U.S. at 361). Second, the inmate "must show that the government substantially burdened that religious exercise." *Id.* Upon satisfaction of these two steps, the burden then shifts to the government for the third act: it "must meet the daunting compelling-interest and least-restrictive-means test." *Id.*

A.

We turn first to the sincerely-held-religious-belief demonstration. "Courts are 'to determine whether the line drawn' by the plaintiff between conduct consistent and inconsistent with her or his religious beliefs 'reflects an honest conviction.'" *New Doe Child #1 v. Cong. of U.S.*, 891 F.3d 578, 586 (6th Cir. 2018) (quoting *Hobby Lobby*, 573 U.S. at 725). "Sincerity is distinct from reasonableness." *Id.* "[O]nce plaintiffs allege that certain conduct violates their sincerely held religious beliefs as they understand them, it is not within the court's purview to question the reasonableness of those allegations," *id.*, or "to say that [plaintiffs'] religious beliefs are mistaken or insubstantial," *Hobby Lobby*, 573 U.S. at 725.

Although the district court only implicitly addressed plaintiffs' sincerity, *Fox*, 2019 WL 1409375, at *8, their satisfaction of this element is not at issue. A "properly developed record" on the sincerity issue "includ[es] testimony from the inmates" and "reference to religious texts."

*Haight*, 763 F.3d at 565–66. This record—which the Department does not contest—more than satisfies. Fox and Perreault testified that they have adhered to Christian Identity for many years, and they spoke in great detail, and, at times, passionately, about their beliefs at trial. They also discussed the Bible, introduced other religious literature into evidence, and testified that they follow the teachings of certain leaders of Christian Identity.[5] Moreover, plaintiffs have maintained this lawsuit for over six years and have not wavered in their dedication to pursuing the relief they request, even as their immediate circumstances have changed by way of transfers to different correctional facilities. The record thus contains a substantial amount of uncontested evidence showing that plaintiffs' religious beliefs are sincerely held. This is sufficient to satisfy step one of RLUIPA.

B.

Under RLUIPA's second step, plaintiffs must establish that the Department's policy substantially burdens their exercise of religion. 42 U.S.C. § 2000cc-1(a); *Holt*, 574 U.S. at 361. RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." § 2000cc-5(7)(A). And "the 'exercise of religion' often involves not only belief and profession but the performance of (or abstention from) physical acts: assembling with others for a worship service, participating in sacramental use of bread and wine, proselytizing, abstaining from certain foods or certain modes of transportation." *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990), *superseded on other grounds by statute*. The record establishes that the three activities at issue—observance of holidays, observance of the Sabbath, and full-immersion baptism—fall within this "capacious[ ]" definition. *Holt*, 574 U.S. at 358.

RLUIPA does not provide a definition for the term "substantial burden." Neither has the Supreme Court. But this court has spoken clearly on the substantial-burden standard in several cases: "[T]he Government substantially burdens an exercise of religion when it 'places

[5] A plaintiff's personal religious beliefs need not be identical to those espoused by the organized religion he follows. "[S]incerity rather than orthodoxy is the touchstone." *Haight*, 763 F.3d at 567 (citation omitted). *But cf. id.* ("[A] prison still is entitled to give *some* consideration to an organization's tenets. For the more a person's professed beliefs differ from the orthodox beliefs of his faith, the less likely they are to be sincerely held." (citation omitted)).

substantial pressure on an adherent to modify his behavior and to violate his beliefs or effectively bars his sincere faith-based conduct.'" *New Doe*, 891 F.3d at 589 (brackets and ellipsis omitted) (quoting *Haight*, 763 F.3d at 565). This is an individualized inquiry. "The substantial-burden question turns on the impact of a government regulation on the individual inmate, not the centrality of those beliefs to canonical texts as interpreted by judges or prison officials." *Haight*, 763 F.3d at 567 (emphasis and citation omitted). In other words, we focus not on the facial validity of the Department's policies, but rather on the validity of those policies as applied to the two plaintiffs in this individual action. *See* § 2000cc-1(a) ("No government shall impose a substantial burden on the religious exercise of *a person* residing in or confined to an institution." (emphasis added)).

1.

We discuss the observance of the holidays and sabbath together because they both focus on group worship. Plaintiffs argue that the Department's policy substantially burdens their exercise of religion because it limits their access to group worship; for example, it has been said that a church is wherever two or three gather to worship. *See Matthew* 18:20, and for people of faith, group worship can be essential.

In the present case, the district court concluded that "[n]one of the evidence plaintiffs have proffered suffices to meet the particularized and relatively heavy burden of proving that the lack of communal worship creates substantial pressure to violate their religious beliefs." *Fox*, 2019 WL 1409375, at *8. But the district court improperly considered the Department's interests in safety and security in coming to this conclusion, commenting that "[w]hile RLUIPA provides certain protections to an inmate's ability to express his religious faith, it does not elevate accommodation of religious observances over an institution's need to maintain order and safety." *Id.* (brackets omitted) (quoting *Treece v. Burnett*, 2007 WL 2815020, at *6 (W.D. Mich., Sept. 25, 2007)). This consideration is relevant at step three, not step two. Its inclusion in the district court's analysis indicates that the court committed legal error by applying the wrong standard. *See Jackson v. City of Cleveland*, 925 F.3d 793, 813 (6th Cir. 2019); *United States v. Conrad*, 507 F.3d 424, 432 (6th Cir. 2007).

Moreover, our precedent demonstrates that, on this record, plaintiffs met their burden under step two of RLUIPA. Consider *Cavin*, where MDOC prevented a Wiccan inmate from observing a holiday called Esbats with other Wiccan inmates. 927 F.3d at 458. This caused him hardship, as he believed that "Esbat services have 'more energy' 'when you have a collective of Wiccans together.'" *Id.* The district court held a bench trial and found that the Department had not imposed a substantial burden on Cavin's religious exercise. *Id.* We reversed. "Why? Because [MDOC's policy] prevents the group worship Cavin seeks. 'The greater restriction (barring access to the practice) includes the lesser one (substantially burdening the practice).'" *Id.* (quoting *Haight*, 763 F.3d at 565). So too here. Plaintiffs wish to worship as a group to observe the Sabbath and holidays. Like Cavin, they "sincerely believe[ ] [they] should celebrate [holidays] communally," and the Department prevented them from doing so. *Id.* at 459; *see also Maye v. Klee*, 915 F.3d 1076, 1083 (6th Cir. 2019) ("Denying a Muslim inmate the opportunity to partake in Eid would substantially burden his free exercise rights, so Maye has alleged a deprivation of his rights under the Free Exercise Clause."); *Whitney v. Brown*, 882 F.2d 1068, 1073 (6th Cir. 1989) (similarly finding a substantial burden for denying Jewish prisoners' participation in Passover Seder).

The Department responds that plaintiffs are not "entirely prevented from observing their seven holy days or communally meeting to worship. They just do not like the way they [sic] that MDOC allows them to do it." That is, they may attend weekly worship services and observe their holidays with members of other religions. According to the Department, plaintiffs' "testimony may demonstrate that they have sincerely held religious beliefs regarding the need for communal worship, but it does not demonstrate that the denial of communal worship—*with members of only the Christian Identity faith*—is a substantial burden." The district court made a similar point. *Fox*, 2019 WL 1409375, at *8 ("[H]e has not explained how congregate worship services are either required by his religion or would substantially further his exercise of that religion beyond those things already permitted to him." (quoting *Mann v. Wilkinson*, No. 2:00-CV-0706, 2007 WL 4562634, at *4 (S.D. Ohio Dec. 21, 2007))).

The record betrays this argument. Fox and Perreault identified at least five reasons why they cannot worship with members of the other religions discussed. First, they cannot worship

with adherents of Judaism because "the Jewish faith denies Jesus Christ." In its brief, the Department says that the two religions could worship together but then suggests that their differences might be too great by stating multiple times that plaintiffs may observe the Sabbath and holidays "with other *Christian* denominations." (Emphasis added.) Second, plaintiffs cannot worship with adherents of Judaism or Seventh-day Adventism because both of those religions calculate their holidays using the lunar calendar, while Christian Identity uses the solar calendar. Third, Seventh-day Adventists observe the Sabbath on a different day of the week than Christian Identity. Fourth, Seventh-day Adventists (and apparently several other Christian sects) use translations of the Bible that plaintiffs consider "adulterated." Fifth, these other religions "don't practice racial separatism."

These facts combine to make Christian Identity (as practiced by Fox and Perreault) significantly different from the comparators proposed by the Department. As the Southern District of Iowa aptly put it in a First Amendment case,

> The exercise of religion commonly involves group worship, and when the only option available for a prisoner is under the guidance of someone whose beliefs are significantly different from or obnoxious to his, the prisoner has been effectively denied the opportunity for group worship and the result may amount to a substantial burden on the exercise of his religion.

*Weir v. Nix*, 890 F. Supp. 769, 788 (S.D. Iowa 1995) (citations omitted), *aff'd*, 114 F.3d 817 (8th Cir. 1997). This is not to say that two different religious groups can never worship together in prison. In plaintiffs' case, however, they have demonstrated that they cannot attend these other religions' services according to their sincerely held beliefs. They even both attempted to worship with members of other religions but found the differences too great to accept. Forcing plaintiffs to choose between attending services on the "wrong" days with individuals whose beliefs they find "obnoxious" and attending no group worship service at all places "substantial pressure on [them] to modify [their] behavior and to violate [their] beliefs."[6] *Haight*, 763 F.3d at 565 (citation omitted). This would be no different from only permitting Catholic inmates to

---

[6]The district court additionally commented that "Mr. Perreault offers no specific dogma of the Christian Identity faith to support his stated need for communal worship." *Fox*, 2019 WL 1409375, at *7. He was not required to. The substantial burden inquiry looks to the importance of religious beliefs to the individual, "not the centrality of those beliefs to canonical texts as interpreted by judges or prison officials." *Haight*, 763 F.3d at 567.

celebrate Christmas in July or observe the Sabbath on Thursdays. Thus, the Department "necessarily place[d] a substantial burden on" plaintiffs' religious exercise. *Id.*

Additionally, the Department's proposed alternative is similar to the "second-best option" of "celebrating in [one's] cell" it raised in *Cavin*. 927 F.3d at 459. We rejected that approach because it "reframes the nature of what Cavin seeks to do: worship with others according to his beliefs. When determining the substantiality of a burden, we cannot look to 'whether the RLUIPA claimant is able to engage in other forms of religious exercise.'" *Id.* (quoting *Holt*, 574 U.S. at 362). Take *Haight*, where we held prison officials' allowance of fry bread at "a faith-based once-a-year powwow" did not excuse their decision to bar the Native American inmates from having corn pemmican and buffalo meat. *Id.* at 559, 565. Or *Holt*, where the Supreme Court similarly concluded that prison officials' allowance of a Muslim inmate to have a prayer rug and access to a religious advisor did not alleviate the substantial burden on his religious exercise they imposed by barring him from growing a beard. *Holt*, 574 U.S. at 361–62.

Another problem with the Department's proposed alternative is that, pursuant to another policy, inmates cannot select which religions' services to attend on a personal basis. According to Perreault, MDOC only allows for one religious call-out, that is, an excuse from one's work detail. *See Maye*, 915 F.3d at 1082. This is evidenced by the way the Department keeps track of inmates' religious beliefs. At some point after Fox converted to Christian Identity, the Department identified his religion as "Protestant" in a religious preference form, over his objection. Fox explained that "I refused to put that I had no preference on my religious preference form, so they marked me as Protestant." He refused to mark "no preference" "because [he has] a preference" and would "be lying if [he] said [he] didn't." The form apparently didn't have a box for "other" or "not listed." Later, when Fox requested that he be allowed to observe a Christian Identity holiday, a chaplain responded that Fox "was Protestant and there were no marked observations of holy days for the Protestant religion."

Nor are we persuaded by the Department's contention that plaintiffs have not identified any other adherents of Christian Identity with whom they seek to worship at their current locations. *See Fox*, 2019 WL 1409375, at *7. MDOC points out that "as a matter of common sense, a single person cannot worship communally." But it is squarely responsible for this

situation. Plaintiffs were housed in the same prison when they initially filed this lawsuit, and have been transferred at least four times each in the years since. And, as discussed above, the Department does not allow inmates to list Christian Identity on their religious preference form, so there is no reliable way to know how many of its adherents are incarcerated at any particular prison.

More importantly, RLUIPA does not require that plaintiffs identify specific individuals with whom they seek to worship. In *Cavin*, the plaintiff acknowledged that "not all Wiccans celebrate Esbats communally," and merely stated that "he and other prisoners would do so if given the chance." 927 F.3d at 458. We found this to be sufficient. After all, "[t]he substantial-burden question turns on the impact of a government regulation on the individual inmate." *Haight*, 763 F.3d at 567 (emphasis omitted). No party suggests that the Department must go out of its way to help adherents of Christian Identity find each other in its prisons or transfer all of them to the same prison. Rather, the Department has imposed a substantial burden on plaintiffs' religious exercise by denying them the opportunity to worship with other adherents of Christian Identity.

MDOC further states that, under a separate policy, it "does not offer group religious services 'if there are [fewer] than five prisoners within the same security level of that institution who actively participate in the religious activities of a group.'" But "courts may not reject RLUIPA claims based on government manuals alone." *Haight*, 763 F.3d at 567. If four adherents of Christian Identity at the same prison and security level requested permission to worship as a group, MDOC would have no more success hiding behind that policy than they do here, where the religious recognition policy is the one at issue. Courts would have to run the same second-step analysis under RLUIPA regardless of what a departmental policy or manual says.

In sum, plaintiffs have met their burden under step two to show that the Department has imposed a substantial burden on their religious exercise with respect to group worship for the Sabbath and holidays.

2.

The district court also ruled that "plaintiffs cannot show that the non-recognition of the Christian Identity faith is the cause of their lack of access to total immersion baptism." *Fox*, 2019 WL 1409375, at *5. Plaintiffs admit that the Department previously approved their requests to be baptized. However, the district court inadvertently disrupted their baptisms by scheduling a settlement conference on the same date. The district court denied plaintiffs' RLUIPA claim on this ground because the Department already approved their requests once and "they have offered nothing to suggest that the request would not be approved again if they are located at a prison facility that can accommodate total immersion baptism." *Id.* at *8.

Without a stipulation from the Department, the district court appeared to be speculating regarding the likelihood of the Department's future actions. Fox testified to the following on direct examination:

> Q Does the MDOC allow you to be baptized by full-body immersion?
>
> A They have not.
>
> Q Why do they not allow it?
>
> A Well, I was signed up and scheduled up there at Chippewa, and I was transferred down here before I was allowed and I've been denied for several different reasons since I've tried.
>
> Q And what were some of those reasons?
>
> A Chaplain Leslie told me that the Michigan Department of Corrections was not a church and they did not perform baptisms, so they didn't have to.

But on redirect, counsel asked Fox if he "ever request[ed] to be baptized again" after the first attempt was stymied. He answered, "I have not."

In any case, plaintiffs have already made their request to be baptized; they are not required to renew that request after their prior, unsuccessful attempt. In the step-two context, it makes no difference whether the Department previously approved their request or not because, as a practical matter, the Department is still precluding plaintiffs from being baptized. In doing so, MDOC continues to impose a substantial burden on plaintiffs' religious exercise. Again,

"[t]he greater restriction (barring access to the practice) includes the lesser one (substantially burdening the practice)." *Haight*, 763 F.3d at 565.

C.

At step three of RLUIPA, the burden shifts to the Department to make two showings. First, it must prove that the imposition of the substantial burden on plaintiffs' religious exercise was "in furtherance of a compelling governmental interest." 42 U.S.C. § 2000cc-1(a)(1). Second, the Department must establish that it used "the least restrictive means of furthering that compelling governmental interest." § 2000cc-1(a)(2). The district court made no such rulings, and the record is not well developed on these issues. "As 'a court of review, not of first view,' we will remand the case to the district court to resolve the point in the first instance." *Cavin*, 927 F.3d at 459 (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005)).

On remand, the district court is directed to take additional evidence as necessary, with the understanding that the Department will face a heavy burden at this step. *See Yellowbear v. Lampert*, 741 F.3d 48, 59 (10th Cir. 2014) (Gorsuch, J.) ("RLUIPA's compelling interest test is a strict one: Congress borrowed its language from First Amendment cases applying perhaps the strictest form of judicial scrutiny known to American law.") And because "the government's asserted interest 'must be genuine, not hypothesized or invented *post hoc* in response to litigation,'" *Haight*, 763 F.3d at 562 (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)), MDOC will be limited to raising the justifications it cited at the time it made the decision to deny plaintiffs' request for recognition of Christian Identity: "(1) that the religious beliefs and practices of the Christian Identity religion can be adequately met by an existing recognized religious group; and (2) that it would threaten the custody and security at all correctional facilities," *Fox*, 2019 WL 1409375, at *1 (brackets, ellipsis, and internal quotation marks omitted).[7]

Finally, we note plaintiffs' baptism claim could be mooted by MDOC giving plaintiffs the relief they requested. *See, e.g.*, *Cardinal v. Metrish*, 564 F.3d 794, 798–99 (6th Cir. 2009).

[7]While McKee's handwritten note explaining his decision referenced only the "custody and security" interest, "Plaintiffs conceded at the beginning of trial that MDOC had preserved both bases for denial of plaintiffs' request for recognition of the Christian Identity faith." *Fox*, 2019 WL 1409375, at *1 n.1.

Given MDOC's previous willingness to do so, we expect that it will be given another opportunity to accommodate plaintiffs' longstanding requests to be baptized.

IV.

For the reasons discussed above, we reverse the district court's judgment and remand for further proceedings consistent with this opinion.